IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 18, 2026 Session

**STATE OF TENNESSEE v. SEAN KIRK WAGNER**

**Appeal from the Circuit Court for Anderson County**
**No. C2C00635        Hector Sanchez, Judge**

—————————————————————

**No. E2025-00637-CCA-R3-CD**

—————————————————————

An Anderson County jury convicted the Defendant, Sean Kirk Wagner, of sexual battery by an authority figure, a Class C felony, and the trial court sentenced him to four years, 364 days of which were to be served at 100% in the county jail and the balance to be suspended and served on supervised probation. On appeal, the Defendant contends that: (1) when the trial court instructed the jury on sexual battery by an authority figure as a lesser-included offense to Count 1, rape, it constructively amended the indictment; (2) the evidence is insufficient to sustain his conviction; (3) the State improperly failed to elect specific facts to support his conviction; (4) the trial court erred when it allowed the State to elicit testimony that the Defendant had referred to the victim and her friends as "sluts"; and (5) the trial court erred when it did not allow the results of his polygraph test to be admitted into evidence. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

Donald A. Bosch, Ann C. Short, and David Eldridge, Knoxville, Tennessee, for the appellant, Sean Kirk Wagner.

Jonathan Skrmetti, Attorney General and Reporter; James E. Gaylord, Senior Assistant Attorney General; and David S. Clark, District Attorney General; Ryan P. Dugan, Brian Gilliam and Emily Abbott, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from allegations that the Defendant digitally penetrated his fifteen-year-old stepdaughter on September 19, 2021. With regard to these allegations, an Anderson County grand jury indicted him for Count 1 rape, a Class B felony, Count 2 incest, a Class C felony, and Count 3 sexual battery by an authority figure, a Class C felony.

## A. Pretrial

### 1. Polygraph Examination

The Defendant filed a motion to introduce the results of a polygraph examination. At a hearing on the motion, he presented Richard Qulia who performed the polygraph examination. Mr. Qulia, who had retired from the FBI in 2004, testified about his credentials and license as a polygraph examiner. He discussed the psychophysiology of such an exam and said that he had performed approximately 3,000 during the course of his career. Mr. Quila discussed the fourteen polygraph protocols that can be used in the United States and the equipment he used to conduct the testing.

The parties stipulated that Mr. Qulia was an expert in polygraphs, but the State did not concede that polygraphs were an accurate measure of whether someone was telling the truth.

Mr. Quila said he conducted a polygraph on the Defendant regarding the topic of sexual contact and sexual penetration of the Defendant's stepdaughter. The result indicated "no deception" in the Defendant's responses. That meant that there was "no significant consistent physiological changes . . . seen at the relevant questions throughout" the examination. Further, when asked about sexual contact with his stepdaughter, the Defendant indicated that there had been none.

During cross-examination, Mr. Quila testified that he had never testified in front of a jury. He said that his interview with the Defendant was not video recorded. Mr. Quila agreed that the Defendant arranged and paid for the polygraph test. Mr. Quila agreed that polygraph tests are not 100% accurate but said that the failure rate in clinical studies is 2%.

Upon questioning from the judge, Mr. Quila explained that this statistic meant that in 2% of cases, a person passed a polygraph test, and the result was later determined to be conclusively false.

The trial court denied the Defendant's motion to introduce the polygraph examinations, finding that it was unreliable and citing several Tennessee Supreme Court decisions. The trial court noted that polygraph results could not be used to incriminate or exculpate a defendant because the results were not reliable and were unduly persuasive.

2

Ultimately, the trial court agreed with the State that "[I]t's well established in Tennessee that the polygraph tests are not reliable, not relevant, not admissible and even if they were, there would be a tremendous risk that they would be unduly persuasive."

## 2. Other Pretrial Motions

The trial court held a hearing wherein the parties discussed lesser-included offenses, the State's proposed notice of impeachment material, and the Defendant's motion to exclude eleven Snapchat videos. The Defendant does not appeal the trial court's decision regarding the Snapchat videos, so we will limit our recount of the facts to only those relevant to the lesser-included offense discussion and the impeachment material, i.e. the State's introduction of evidence that the Defendant referred to the victim and her friends as "sluts."

The victim testified that she was eighteen years old at the time of the hearing and fifteen at the time that the allegations in this case occurred. The Defendant was her stepfather at the time that she alleged that he inappropriately touched her as she was sleeping on the couch because she was sick. Immediately after the inappropriate touching, the victim went into her room, shut and locked the door, and texted her mother to come into her room. When her mother came, the victim told her what had happened. Her mother left and went to speak to the Defendant, who then came into her room and apologized repeatedly saying he did not mean to do it.

The victim was sitting on her bed at the time, and she had next to her a human-sized teddy bear. Because the Defendant kept saying sorry repeatedly, for hours, she decided to record him to show her friends how he was acting. She never thought of the videos as having evidentiary value, she simply intended to show her two best friends how the Defendant was acting. She said the Defendant was saying "outlandish stuff that was completely against . . . what he [had] just [done]." She recorded the videos because she thought her friends, who also knew her stepfather, would want to hear what he was saying. The videos recorded events within hours of the alleged rape. She took eleven, one-minute videos. The videos were then played sequentially for the trial court.

During cross-examination, the victim testified that she believed that the alleged rape occurred around 3:30 a.m. because the Defendant got home from work around 3:00 a.m.

The victim was then asked by the State about statements that the Defendant made that were sexual in nature towards the victim and her friends. When her friends were hanging out at the house, the Defendant would come in and say, "Hey, sluts." The victim said that he called them "sluts all the time" and that she and her friends would "kind of laugh it off." She said, looking back, she found the behavior "weird," and she and her

3

friends always found his behavior weird. He "just always said weird things to us." The Defendant's behavior was witnessed by the victim, her friends, her sister, and her mother.

The victim recalled that she was in eighth grade when the Defendant and her mother married, and the inappropriate touching occurred two years later.

During cross-examination, the victim agreed that she and her friends never asked the Defendant not to call them "sluts." The victim recalled that the Defendant had inappropriately touched her one other time in sixth grade. She was in her bed, and her mother was in bed with her because she was scared to sleep by herself. The Defendant came in and got into bed with her and her mother, on the other side of her mother. The Defendant began giving her mother a "massage or something," and he reached over and touched her buttocks. The victim said that the touch was sexual in nature. The victim said she told her sister about the touching, and her sister told her mother, but nothing came of the allegation.

The victim's mother, April Wagner, testified that she was still married to the Defendant but that they were legally separated. She said she recalled the day she learned of the allegations. The victim, who had been sick that week, texted her and asked her to come to her room. Ms. Wagner believed it was to give her medicine, but, when she arrived, the victim was crying and told her about the inappropriate touching. Ms. Wagner immediately confronted the Defendant, who was in the kitchen, and asked him what was going on. She told the Defendant that the victim had said he had touched her sexually and demanded to know what happened.

The Defendant went straight to the victim's room and began apologizing. She described the Defendant as "begging for [the victim's] forgiveness." She said that he was saying how sorry he was and trying to convince the victim that he did not mean to do anything to her. Based on the Defendant's admissions and statements, Ms. Wagner was "very angry and shocked and just upset . . . [and] disgusted . . ." in part because the Defendant compared his actions to "cheating" and said he had never done anything inappropriate "online." Ms. Wagner said the recordings were a good sample of the Defendant's whole conversation and that he never denied touching the victim.

During cross-examination, Ms. Wagner agreed that the Defendant never said anything other than that he "touched" the victim. He later told her that he was referring to "spanking" the victim, but Ms. Wagner did not believe him. Ms. Wagner said she lived with the Defendant for less than two weeks after the victim's allegation. He had moved out by the time DCS came to investigate approximately two months later. The victim had disclosed the allegations to a cheerleading coach who had reported it to authorities.

4

During redirect, Ms. Wagner said that, when she first confronted the Defendant, she told him that the victim had said that he had put his fingers in her private area. It was after that that the Defendant went to the victim's room and repeatedly apologized. Later that evening or the next day, the Defendant alleged that he believed this confrontation was about him spanking the victim.

Ms. Wagner said she heard the Defendant call the victim a "slut." She said that "stuff like that" went on all the time. It seemed to be said in a joking manner like, "Hey, there's the sluts," when the victim and her friends would arrive.

Concerning the appropriate lesser-included offenses, the Defendant's counsel said that there had previously been a joint notice of lesser-included offenses that had been filed by prior counsel. The trial court went through the charges and applicable lesser-included offenses one by one. For Count 1, rape by force or coercion, the Defendant contended the correct lesser-included offenses were sexual battery by force or coercion and misdemeanor assault, as well as the attempts. The State posited that sexual battery by an authority figure was also a lesser-included offense of rape by the stepfather. It provided an email from the Defendant's previous counsel in which he agreed to as much. The Defendant's Counsel noted, however, that Count 3 was for sexual battery by an authority figure, so the lesser-included offense instruction of that under Count 1 did not make sense. The trial court took the matter under advisement and said it would issue a written ruling.

For Count 2, incest, the parties agreed that criminal attempt was the only applicable lesser-included offense.

For Count 3, sexual battery by an authority figure, the lesser-included offenses would be misdemeanor assault, offensive touching, and criminal attempt. The parties indicated that they would research whether child abuse was also an applicable lesser-included offense.

The trial court filed a written order on these issues. About the 404(b) evidence, namely the reference by the Defendant to the victim and her friends as "sluts", the trial court found that the "proposed evidence [wa]s relevant." After discussing the 404(b) requirements, the trial court found:

> Here, this Court cannot find that the proposed evidence of referring to the alleged victim as a "slut" is overly prejudicial. This Court has found above that the material issue of intent exists in the proposed proof and the proposed proof is not being offered to prove the character of the Defendant to show that he acted in conformity with that character trait in the charged offense. The State asserts that the purpose of introducing evidence of such

5

acts demonstrates a degree of grooming to accomplish the charged offense of rape. Furthermore, sufficient proof was offered for this Court to find by clear and convincing evidence that these acts occurred and was common place. Finally, the probative value of the evidence is not outweighed by the danger for unfair prejudice.

The trial court ruled that the Snapchat videos were admissible, and it denied the Defendant's motion in limine to exclude those.

The State filed superseding indictments, indicting the Defendant for: Count 1 rape; Count 2 incest; Count 3 sexual battery by an authority figure. The Defendant filed proposed jury instructions. They included an instruction for rape, and an instruction for sexual battery, sexual battery by an authority figure (pursuant to both applicable theories), child abuse, and assault as lesser-included offenses of rape.

### 3. Trial

At trial, the parties presented the following evidence: The victim testified about her relationship with the Defendant who was her stepfather. She had known him since she was in fifth grade, which was seven years before trial. At the time of these allegations, the victim lived with her mother, the Defendant, and her sister. She thought the Defendant was "a good person," and she "liked" him, having nothing against him. The victim said the Defendant always tried to be the "cool dad" around her and her friends. In jest, he would call her, her sister, and their friends "sluts." She did not like it and found it weird and said it "weirded [her friends] out," but she laughed it off.

Leading up to this incident, the victim was in her sophomore year of high school, a member of the cheerleading team, and often busy with friends. She was very fond of her cheer coach, Ms. Holly Martinez, as was the whole team.

On a Friday, September 18, 2021, she started feeling unwell and knew she was getting strep throat, a common problem for her. She went to the doctor but was still feeling unwell with body aches. She felt weak and her throat was hurting, so she laid on the couch in the living room, which was close to everything in the house and closer to where her mother slept. It made her feel better to be closer to her mother, who took care of her, as the two had a good, trusting, and happy relationship.

The victim was awakened by the garage door opening when the Defendant returned home from work. She was lying on the couch with her eyes closed trying to fall back asleep. The Defendant came in through the garage door, walked over to the kitchen, and

6

she heard him walking around. She had her eyes closed and was facing away from him on the couch when she heard him come up behind her. The Defendant walked away, went back to the kitchen, and came back behind her. He did this a couple of times. The next time, he came back and was muttering words to himself. The victim heard the Defendant say, "[S]he's so hot."

At one point the Defendant returned and touched her buttocks and was rubbing them. She was so shocked that she just lay there, frozen. She had on shorts, and the Defendant moved the middle side of her shorts over and inserted his fingers inside her and moved them in and out. The victim did not know what to do, was in shock, and froze. She said that he did not touch her for very long, maybe a minute, and then he stopped. The victim said the Defendant's touching "hurt a little bit" and was a "very, very uncomfortable feeling."

The victim believed that the Defendant thought she was still asleep. The Defendant grabbed her hips and turned her flat on her back, so she was laying with her face up. He leaned on the couch and tried to take her shorts off. The victim said she "just couldn't do it," and she opened her eyes and shoved him off her and said, "what the f**k are you doing." He backed up and started "freak[ing] out." The Defendant kept saying "I'm sorry, I'm sorry over and over." He went quickly to the kitchen, and the victim ran to her room and shut and locked the door. She texted her mother, Ms. Wagner, and asked her to come into her room.

Ms. Wagner arrived in seconds, and the victim told her what had happened, and she became upset. Ms. Wagner left the room and confronted the Defendant. Shortly thereafter, the Defendant came into her room and kept saying "I'm sorry" and "don't leave me" repeatedly. After thirty minutes of apologizing, the victim made a few Snapchat recordings of Defendant without his knowledge. She explained that she intended to show her friends, who knew the Defendant well, the videos of him apologizing after he had assaulted her.

The State then played the eleven Snapchat videos. The lighting in the videos was dark, as the victim's lights in her room were not illuminated. The victim explained that she laughed at one point because she found it ridiculous that the Defendant was being hysterical right after sexually assaulting her. She said that his apologies were repetitive and that she found it annoying. She had no intention of forgiving him and wanted him to get out of her room. The victim said that, at the time of the videos, she was in shock, overwhelmed, and annoyed. Ms. Wagner finally convinced the Defendant to stop going back into the victim's room. Ms. Wagner then got into bed with the victim, and the two fell asleep together.

7

The victim never thought to call the police.  She did not want the Defendant to get into trouble or to see Ms. Wagner and the Defendant divorce.  The victim moved in with her father because the Defendant was still staying in the house with Ms. Wagner.  She told her friends about the incident but not her father or her sister.  She said she was scared and wanted to ignore it.  She was also very busy with cheerleading.

This incident very much affected the victim, and she wanted to tell someone because it bothered her so much.  She felt she needed to tell an adult, and, after practice one day, she told her cheer coach, Ms. Martinez, about the incident.  Ms. Martinez told her that she was going to have to report it.

After Ms. Martinez reported the incident, the victim told her father and sister what had happened.  She went to a child services center and told her story.  Her forensic interview was played for the jury and in it, she recounted the events of the rape consistently with her trial testimony.  She also spoke with a detective, told her the same story, and showed her the Snapchat videos.

The victim said that the Defendant never spanked her or disciplined her.  She said that the kitchen was clean when she went to sleep on the couch the evening of the incident.  She said that the Defendant did not spank her that evening, but he inserted his fingers into her vagina.

During cross-examination, the victim testified that she was lying approximately ten feet from her mother, but in different rooms, when this touching occurred.  The victim did not recall how many times she texted her mother after the incident, either once or twice, but she agreed that she said twice in her forensic interview.  She agreed that she may have only told her mother that the Defendant "touched" her and not told her to what extent.

The victim agreed that she stayed in the same house with the Defendant for a few nights before moving to her father's house.  As far as she was aware, her mother never called the police, reported the incident, or filed for an order of protection.

The victim said that the first Snapchat video was taken at 7:30 in the morning and the last video was taken at 7:58 a.m.  She agreed that the touching may have occurred later during the night than she estimated and actually may have occurred at around six in the morning.  The Defendant sometimes worked longer shifts and got home around that time.

The victim testified that she texted her mother that morning by iMessage.  She was uncertain why those messages were no longer on her phone, and she believed that they automatically deleted.  The victim said that she did not delete any messages from her

phone. She said she did not remember sending text messages to her aunt after she recorded the Snapchat videos.

Ms. Wagner testified that she and the victim's father divorced in 2016, and she began a relationship with the Defendant around the same time. She married the Defendant in 2020 and lived with him and their daughters in his home. Ms. Wagner confirmed that the victim was sick with strep throat, which the Defendant knew, the weekend of this incident. Every time she got sick, she would sleep on the couch to be near the kitchen and her mother.

Ms. Wagner said that she slept with three fans on for cool air and white noise. The morning of this incident, she awoke to a text message from the victim asking if she was awake. Ms. Wagner responded, "yes" and went to the victim's room. Ms. Wagner said the victim was crying hysterically, and Ms. Wagner asked her what was wrong. The victim told her that the Defendant had been saying things he wanted to do to her sexually while he thought she was asleep. He then pulled down her covers, touched her sexually, and put his fingers inside her.

Ms. Wagner went straight to the kitchen where the Defendant was located and shoved him and said "what the f**k is going on. [The victim] just said that you touched her sexually." The Defendant responded that he did not mean to hurt her, and that he did not mean to touch her, and he started apologizing. He repeatedly asked for forgiveness and said that he did not know why he did it.

Ms. Wagner asked him why he would do this. She also did not understand the quick switch in his demeanor from sexually abusing the victim to then profusely apologizing. She did not understand what he hoped to accomplish by asking her to forgive him that quickly after putting the victim through the sexual assault.

Ms. Wagner said she and the Defendant had had previous conversations about infidelity. She told him that she would not tolerate being cheated on. In the victim's room, the Defendant mentioned that comment, as evidenced by the victim's recordings. She found it "absurd" to compare sexually touching her daughter to cheating on her. Clearly, sexually touching her daughter was "way worse," but the implication that he had touched the victim sexually was clear in the comparison. When Ms. Wagner said this is way worse, the Defendant said, "I know."

Also, while they were in the victim's room, as was recorded, the Defendant said, "I touched your daughter." Ms. Wagner said, "do you honestly think that she should be able to brush this under the rug?" She explained that she said this because the Defendant was

9

acting like they should accept his apology and they could come together again as a family. She found this delusional.

On the recordings, the Defendant also said, "I never do anything online," which Ms. Wagner took to mean that he did not have inappropriate interactions with other women online. She responded that none of that mattered. Ms. Wagner felt sick and disgusted in part because the Defendant was admitting to what he had done and expecting the victim and her to be okay with his actions.

After the Defendant went out of the victim's room, Ms. Wagner collapsed, exhausted on the couch. The Defendant kept coming over to her apologizing. She asked him, "why would you do this?" She stayed on the couch for some time, and the Defendant went in and out of the house, and then she went back to the victim's room and stayed there with her. She said that they talked and were trying to figure out what to do. Ms. Wagner thought the best course of action was to take the victim and her other daughter and leave, but she did not feel she had anywhere to go. She was embarrassed and ashamed and did not want to involve anyone else. She felt the right thing to do was for the Defendant to leave, but he did not. He locked himself in their bedroom, and she did not see him the rest of the evening.

The next day the victim had left, and it was just the Defendant and Ms. Wagner present in the home. The Defendant was talking to himself out loud in Ms. Wagner's presence. He said, "I was just tired, I worked a long shift and when I came home everything was a mess and I asked [the victim] to clean it up and she said, no, so I spanked her." Ms. Wagner said, "that's ridiculous," and the Defendant kept saying "that's what happened." Ms. Wagner said that her kitchen was clean that night and that it would not have been the victim's responsibility to clean it anyway, in part because she was sick. Ms. Wagner said that the Defendant had never disciplined her children and that the two had never had a conversation about him disciplining her children.

The victim left home to stay with a friend because the Defendant did not move out immediately. Ms. Wagner said she was in shock and her state of shock lasted months. The Defendant left the home two weeks later.

Ms. Wagner recalled the police involvement, saying that the victim was ready to tell someone, and she told her coach what had happened. Ms. Wagner was relieved that the victim had told her coach. Ms. Wagner spoke with DCS and told them what had happened. She said, however, that she did not want to be involved in the investigation because she was not strong enough mentally or emotionally to handle it at that time.

10

During cross-examination, Ms. Wagner testified that she and the Defendant both valued a clean house but neither of them became upset if it was not clean. If the Defendant saw a mess in the kitchen or elsewhere, he would clean it up himself. Further, the Defendant was a new stepfather, so if he was upset about something that her daughters had done, he would come to her. She was the disciplinarian of her own children.

On the morning of this incident, the Defendant was working night shifts and would have arrived home at 6:40 or 6:45 a.m. She received the text from the victim at 7:00 a.m. Ms. Wagner said that the first time she heard the Defendant call the victim and her friends "sluts," she told him that he should not do that. The victim and her friends, however, laughed, so it seemed light-hearted. The Defendant also interacted with her older daughter similarly, so it was not directed specifically at the victim.

Ms. Wagner agreed that her trial testimony was more detailed and contained additional facts than her previous interview. She said that, when she first confronted the Defendant, she told him that the victim accused him of touching her sexually. The Defendant said that he did not mean to touch the victim and that he did not mean to hurt the victim. She disagreed that this supported his assertion that he was apologizing for spanking the victim rather than for raping her. Ms. Wagner was not aware the victim was recording these apologies, and she was not aware if the victim was texting Ms. Wagner's sister shortly after these recordings were made.

Ms. Wagner agreed that the victim stayed in the same home with the Defendant for two nights after the incident. She explained that she was in shock and, in hindsight, was not capable of adequately protecting her daughter. Ms. Wagner recalled that she did not call the police, in part because the victim asked her not to, and she regretted her decision.

Ms. Wagner said she met with DCS investigator, Catherine Ortezia, in December of 2021. She met with her on the porch and did not invite her into the home because she did not want to be part of any investigation. Ms. Wagner said that the Defendant moved out of the home in October 2021. She agreed that her divorce paperwork from him indicated that they separated in October 2023, but she said she emailed her attorney to change that date and assumed it had been changed when she signed the paperwork. Ms. Wagner agreed that, after the October 2021 separation, she still spoke with the Defendant for hours on the phone and even went to see him while he was living at his sister's house.

Ms. Wagner agreed that she met with the Defendant, and he asked her to sign a statement, which she did. In the statement, it said that on the date of the incident the Defendant told her that he spanked the victim for making a mess in the kitchen and living room. It said that the Defendant told her that, when he touched the victim, he spanked her across the bottom three times. According to Ms. Wagner, the Defendant became upset that

he spanked the victim, and he apologized to her. The statement continued that the Defendant was tearful and remorseful and had always maintained his position. This statement was signed on November 15, 2022.

During redirect examination, Ms. Wagner said she did not write anything included in the statement she signed, rather it was written by the Defendant. She said the statement was true, but he did not tell her that he spanked the victim until the following day. She said that the statement was simply the Defendant's version of the events. Ms. Wagner explained that she was in a terrible mental state and that the rape and court process was taking a toll on the victim. Ms. Wagner just wanted the situation settled. Ms. Wagner reiterated that, on the morning of the incident, she told the Defendant that the victim alleged that he touched her sexually by inserting his fingers inside her to which the Defendant said he was sorry and that he did not mean to hurt her.

The victim's cheer coach, Holly Martinez, testified that she met the victim before her freshman year and was still her coach at the time of these allegations. She described the victim as "[q]uiet, reserved, nice." She recalled the conversation where the victim disclosed that her stepfather had sexually assaulted her. The victim stayed after practice with a friend, C.G.,[1] and told Ms. Martinez about an incident that had occurred. Ms. Martinez said she was required to report what the victim had said to administration, and she did so immediately.

Ms. Martinez found her athletic director, who was also a principal, and reported the information. She also went to the head principal at Anderson County High School and met with him and the School Resource Officer ("SRO") and told them what the victim had disclosed.

During cross-examination, Ms. Martinez said that the victim told her that the Defendant had digitally penetrated her vagina. She did not recall whether the victim said that the Defendant tried to pull down her shorts. Ms. Martinez agreed that she later wrote an email to Officer Culver and Detective Baird regarding this incident. The email did not include that the victim said that the Defendant tried to pull down her pants or mention that he had "stuck his fingers in [the victim's] vagina."

During redirect examination, the State asked Ms. Martinez what the victim had told her. Ms. Martinez said that the victim said that she was at her house on the couch, sleeping, facing way from the room. The Defendant came into the living room area, and the victim pretended to be asleep. He put his hands down her pants, and she still pretended to be asleep. The victim then knocked him away and got up and ran down the hallway to her

---

[1]For her privacy, we will refer to the victim's friend, who is a minor, by her initials.

12

bedroom. She reviewed the email from cross-examination and noted that it said that the Defendant put his hand down her pants or panties and that the victim got up from the couch and ran into her bedroom, locking the door.

Tyler Culver, the SRO at the time, testified and confirmed Ms. Martinez's account of the events. Because the allegations were sexual in nature, Officer Culver notified DCS. Officer Culver never spoke with the victim.

The parties stipulated that the nurse practitioner who conducted the victim's forensic medical examination did not find proof of rape. Proof of digital penetration was neither excluded nor included as part of the findings of the exam.

DCS employee Catherine Oteiza testified that she interviewed the victim and the victim's mother and father.

During cross-examination she said that she was aware of the recordings on the victim's phone and had listened to them once on the day of the forensic interview. She was unsure of how many videos she watched and listened to, and she agreed she watched them at the same time as Anderson County Sheriff's Department Detective Sharon Baird, who was assigned to this case.

Ms. Oteiza said that three referrals for this same case came into her office within twenty-four hours. The first referral was on October 3, 2021, and the second two followed. Ms. Oteiza interviewed the victim's mother, Ms. Wagner, at her home. Ms. Wagner did not invite her in. Her notes from that day were as follows:

> [Ms. Wagner] reported [the Defendant] is no longer living in the home and they are not together. [Ms. Wagner] stated she and [the Defendant] have been married a year. [Ms. Wagner] stated she is not sure what she is going to do at this point. [Ms. Wagner] stated she and [the Defendant] have not been having any marital issues. [Ms. Wagner] stated [the Defendant] was a really good stepdad. [Ms. Wagner] stated she did not see anything that night. [Ms. Wagner] stated [the Defendant] said he did not do it. [Ms. Wagner] stated [the Defendant] said he spanked her. [Ms. Wagner] reported [the Defendant] told her he came home from work and was tired. [Ms. Wagner] stated [the Defendant] said he got upset because there were dishes all over the kitchen. [Ms. Wagner] stated [the Defendant] said [the victim] made this up because she was angry he spanked her. [Ms. Wagner] denied [the Defendant] had ever spanked [the victim] before then . . . . [Ms. Wagner] stated she did not spank [the victim]. [Ms. Wagner] stated she does not know what to believe but will support her daughter. [Ms. Wagner] stated [the

13

victim] will never be around [the Defendant] again. [Ms. Wagner] stated she will always put [the victim] first and did not see that there was a reason for [the victim] to lie about what happened. [Ms. Wagner] stated that this has been very hard on her. [Ms. Wagner] stated she does not want to be interviewed about this again. [DCS worker Oteiza] explained the global assessment and asked to schedule a time to complete. [Ms. Wagner] agreed but later declined stating any further questions and inquiries could be sent to her attorney.

Ms. Oteiza agreed that Ms. Wagner had not filed an order of protection for the victim.

Sharon Baird, a detective with the Anderson County Sheriff's Department, testified that she was the assigned detective for this case. She observed the victim's forensic interview from the audio/video room in real time. After the interview, she spoke briefly with the victim about the interview recorded on the victim's cell phone. The victim attempted to retrieve the videos but was having trouble. Detective Baird was about to obtain a portion of the videos by recording them with her phone. She did not confiscate the victim's phone at that time, which she deemed a mistake. Detective Baird said that she unsuccessfully attempted to interview Ms. Wagner.

During cross-examination, Detective Baird testified that, if the victim was speaking by text with someone after she took the videos of the Defendant, she would have liked to interview that person. Detective Baird agreed that during the forensic interview, the forensic interviewer told the victim that they were going to need to collect her phone for evidentiary purposes. The forensic interviewer then left the room, and the victim began operating her phone. When someone came back into the room, the victim put her phone down again.

During redirect examination, Detective Baird said that she viewed the videos on the victim's phone after the conclusion of the forensic interview.

The Defendant offered Matthew Ooten, who testified that he was the victim's attorney. Ms. Wagner and the victim came to see him regarding a subpoena by the defense for the victim's messages, text messages, and all other social media platforms. After being retained, he took the position that the victim should not have to surrender her whole phone, but they agreed to turn over information from a set date range that included the time period of these events. Mr. Ooten agreed that he reviewed the victim's phone over a year after this alleged assault. Therefore, he only reviewed and turned over files that were still on her phone, or in her Snapchat account, as of the date of his review. He said that he did not search for anything in a deleted folder and only searched what was on her phone at that

14

time. Mr. Ooten further recalled that when he met with all the parties to turn over the phone evidence, nothing out of the ordinary occurred. He did not recall the victim saying that she felt intimidated.

During cross-examination, Mr. Ooten agreed that there were times during the meeting that the Defendant's counsel and the defense investigator were behind the victim leaning over her while she was looking at her phone attempting to retrieve the data. This was something that happened "a lot" during the meeting, and he was uncertain how the victim felt about this occurring. The meeting was long, and the victim, who was a minor, did not have either parent present.

Elizabeth Sherrod testified that her husband, Dan Sherrod, had been her partner in business for eleven years in Sherrod Investigative Group, LLC. She described her training and background and said that the Defendant's first attorney, Dan Eldridge, had hired Sherrod Investigative Group to assist in the Defendant's case. In mid-January of 2022, Ms. Sherrod interviewed Ms. Wagner at Mr. Eldridge's office. Ms. Sherrod said that Ms. Wagner was very willing to be there and to speak with her and that at no time did she ask to stop the interview. The interview lasted a couple of hours, and the Defendant was not present during the interview.

Ms. Sherrod testified that Ms. Wagner said that she and the Defendant had complained to each other about the messes in the house that her daughters had made but that the Defendant would not say anything directly to them because he did not want to upset them. He wanted her daughters to like him.

Ms. Wagner told Ms. Sherrod that the Defendant said that he came home from an eighteen- or twenty-hour shift to find a mess in the kitchen. He got upset and spanked the victim and then felt bad about it and apologized.

During cross-examination, Ms. Sherrod said that the interview with Ms. Wagner was not recorded but that she did take notes. She provided those notes to the Defendant's attorneys only, as she was employed by them.

Dan Sherrod, a private investigator, supervised the downloading of the Snapchat video files, at which the victim was present. He had previously met with the victim's father, Mr. Kiehl, and their interactions were cordial. At the meeting with the victim present, nothing unusual happened. No one made any complaints about Mr. Sherrod's behavior.

After the meeting, Mr. Sherrod met again with the victim's father to serve a second subpoena. When the victim's father got out of his truck at the meeting, it was obvious that he was "very angry." Mr. Sherrod described the victim's father as "combative."

On cross-examination, Mr. Sherrod said that the victim's parents were not present at the meeting where he supervised the victim download her Snapchat video files. He did not recall walking up behind the victim while she was using her phone at the meeting.

Angela Dawn Carden, the victim's aunt, testified that Ms. Wagner is her sister. She said that she regularly texted with the victim, but she did not find out about the victim's allegation against the Defendant until a week after it occurred when the victim's sister told her about what had happened. Ms. Carden said that the victim did not text her the morning of this incident to tell her what had happened.

During cross-examination, Ms. Carden testified that she and the victim did not text daily and usually communicated weekly.

The Defendant testified and said that he never inserted his fingers into the victim's vagina, he never rubbed her buttocks, and he never pulled her pants down. He said that the only time he touched her was to spank her. He explained that he worked as a security officer for the Department of Energy, and he had maintained that employment since 2006. He held a "Q" security clearance. The Defendant discussed his two biological children and his grandchildren and his purported healthy relationship with them.

Turning to his relationship with Ms. Wagner and her daughters, he described the unspoken rule between him and Ms. Wagner that she be the disciplinarian of her own daughters. He said Ms. Wagner's daughters did not have any responsibilities around the house and that Ms. Wagner assumed all of those herself. Both he and Ms. Wagner cleaned, but she did not work outside the home, and he worked eighty-hour work weeks, so cleaning fell more to her.

The Defendant said that he cleaned up after the victim daily. He spoke with Ms. Wagner about some of this messy behavior, and Ms. Wagner would simply say that she would take care of it. The Defendant never spoke directly with the victim about cleaning up after herself. He explained that he never wanted to have an argumentative relationship with Ms. Wagner's daughters, so he avoided the confrontation. The Defendant said that he loved Ms. Wagner and her daughters still and would welcome them all back home.

About September 19, 2021, the Defendant said that he went to work after lunch on Saturday, worked an almost seventeen-hour shift, and returned home in the early morning of September 20, 2021. It took him twenty minutes to return home, and he was tired when

he got home. He said that he carried his backpack into the house and placed it in his bedroom on his chest of drawers. He went to Ms. Wagner, who was sleeping in the bed, kissed her and told her that he was home safely.

The victim was sleeping on the couch outside his bedroom, and he walked within three feet of her as he went into his bedroom. The house is small, and where the victim was sleeping was approximately eight feet from where Ms. Wagner was sleeping.

Mr. Wagner said he then went into the kitchen to cook his breakfast, and he described the kitchen as a "disgusting mess." For example, there was what appeared to be spilled Ramen noodles on the glass top stove. The kitchen was so messy that he could not cook breakfast, which frustrated him as he was hungry and exhausted. He walked straight over to the victim and spanked her with an open hand, hard three times on the bottom. The victim was covered by a blanket at the time. He did not recall saying anything at the time, but he thought that the victim knew why he spanked her. The Defendant then walked straight back to the kitchen.

The Defendant denied that he said or did anything sexual. He said he never used the word "hot" and never walked back and forth between the victim and the kitchen. When he turned around, he saw the victim standing, looking at him angrily. She then went into her bedroom. The Defendant began making his breakfast and saw Ms. Wagner go to the victim's bedroom. Ms. Wagner then came out of the bedroom and asked the Defendant if he had touched her daughter.

The Defendant told Ms. Wagner that he hit the victim with an open hand. Ms. Wagner left and went back to the victim's bedroom, and he did not follow her. Ms. Wagner came back into the kitchen and "demanded" that the Defendant apologize to the victim. The Defendant said that when he spanked his biological children he would ask for forgiveness afterwards because he always felt remorseful. The Defendant said that he was so exhausted and based on Ms. Wagner's demeanor, he was scared she would leave him over the fact that he spanked the victim. He said that the Snapchat videos of him were of him apologizing for spanking the victim. He was not apologizing for touching her sexually.

The Defendant agreed that, in one of the videos, he said "I can't promise because I'm a liar, I made the biggest mistake ever and I hurt the one I love and I hurt the one that I love most and I never want to have a division between us." He said this was referring to a promise that he made to himself that he would not discipline his stepdaughters, but despite this, he spanked the victim. He said he could not promise because he was unsure whether he would spank her again.

17

He recalled that on one video he said that he has never talked to another woman or done anything inappropriate online, and Ms. Wagner responded that this was not what they were discussing. He said that he was referring to the fact that there was a "chronic problem of nonstop messes" in the house and that this was family business that he would not discuss online using social media, which he knew other people did.

He agreed that in the videos he made statements about how he had never cheated on Ms. Wagner and about how she said that if he did cheat on her that she would leave him. Ms. Wagner responded that this was not cheating and that it was worse. The Defendant said he responded, "I know," because he felt that spanking the victim was worse than cheating on his first wife. The Defendant alleged that the videos did not reflect everything discussed that morning and that some of his statements were taken out of context. His statement of cheating was made in response to Ms. Wagner bringing up him cheating on his first wife, a statement that was not recorded.

The Defendant said that he left the victim's bedroom and went to his own room to fall asleep. When he awoke, Ms. Wagner was present, but Ms. Wagner's daughters had left to go shopping together. The Defendant said that he and Ms. Wagner had a normal day together and that there was nothing unusual about her demeanor. The Defendant said the victim returned home and slept in her bedroom. Ms. Wagner slept in the bed with him, and the victim remained living with them for a couple of days.

The Defendant identified a copy of his cell phone account that he pulled up electronically and said he did not alter the document in any way. He identified the victim's phone number. The Defendant reiterated that the victim stayed at home, without incident, on Monday night and Tuesday night following this incident. On Wednesday, she went to spend the night with a friend, where she stayed for a few nights. She then came back home for a few nights and then went to her father's house. He described her behavior as ordinary saying that she did not seem angry or as if she was ignoring him. During this time, things with Ms. Wagner also seemed normal, they slept in the same bed, and Ms. Wagner did not raise an issue with him.

After the victim left for her father's house, Ms. Wagner told the Defendant that he needed to leave the house, or she was going to leave. The Defendant said that Ms. Wagner still did not tell him there was a sexual allegation against him, but she said there was a problem between the Defendant and the victim, so she was going to leave, or the Defendant was going to have to leave. The Defendant said that, later, as he was driving to his sister's house, Ms. Wagner called him and asked him why he had sexually assaulted her daughter.

Since this incident, the Defendant and Ms. Wagner had spent multiple nights together, either at his sister's house or at a motel. They did not let the victim know  they

were together, as Ms. Wagner did not want to "rock the boat with her and [the victim]." The Defendant believed that Ms. Wagner believed that he spanked the victim and not that he sexually assaulted her.

The Defendant said that Ms. Wagner was lying in her trial testimony and that he never sexually touched the victim. He said t he only spanked the victim three times sharply to discipline her for making a mess in the kitchen.

During cross-examination, the Defendant agreed that he was the victim's stepfather and lived in the home with the victim. He said that, before this incident, he had a good relationship with both the victim and Ms. Wagner. He agreed that the victim was not responsible for cleaning the kitchen and that Ms. Wagner took on that responsibility. He agreed that he and Ms. Wagner worked on the house every day, cleaning often and that he often cleaned up after the victim's messes. Ms. Wagner liked to clean, and sometimes cleaned other people's houses for money, and usually cleaned the house before going to bed. The Defendant said Ms. Wagner was the sole disciplinarian of her daughters.

The Defendant said that, on this day, he knew that the victim was sick. He got home at 6:30 a.m. The Defendant agreed he started cleaning the mess, got frustrated, went to the victim who was asleep on the couch, and spanked her three times as hard and fast as he could without saying anything.

The Defendant agreed that he sometimes said, "[H]ey, sluts," to the victim and her friends by way of greeting. He did this many times.

Going back to the incident, the Defendant said that, after spanking the victim, he saw Ms. Wagner leave their bedroom and go to the victim's bedroom. He had not heard the victim call out for her mother before this. The Defendant said that Ms. Wagner then came to him directly and asked him if he had touched the victim. He responded that he had "hit" the victim. She then demanded that the Defendant go apologize to the victim, and the two went to the victim's room together.

The Defendant said that he was apologizing for spanking the victim and that spanking her, while justifiable, was the worst thing he had ever done to her. He agreed that the video showed him saying that he was one hundred percent in the wrong but said that he said this because he was remorseful.

The Defendant agreed that each of the video recordings was of him and what occurred that morning but said that the recordings were snippets taken over an almost thirty-minute timeframe. The Defendant agreed that he said, "I can't promise because I'm a liar." He said this referred to his promise to himself that he would not discipline his

19

stepdaughters. He agreed that he said on the video that this was the biggest mistake he had ever made and that he did not want to lose the victim and Ms. Wagner. He also agreed he said, "I'm sorry I hurt you, [Ms. Wagner], I think I've hurt you more than anybody on this planet, I didn't plan to." He again claimed this was about spanking the victim.

The Defendant agreed that he said, "I touched your daughter" but explained that he used the word "touch" instead of the word "hit" when discussing spanking the victim. Ms. Wagner responded that the Defendant could not "just act like that is a normal thing you move on with and never deal with." The State played several other snippets from the videos, and the Defendant maintained that they each were about spanking the victim.

The State highlighted the portion of the video where the Defendant said, "I'm not what all those other people do. I talk to nobody never. I don't do anything online." He maintained these comments were about how he did not discuss any of their family problems on social media. He denied that he was talking about online dating or cheating or looking at pornography online. The Defendant agreed that, at one point, he acknowledged that Ms. Wagner had told him that if he ever cheated on her that she was leaving him, and he told her he had never planned to cheat on her. Ms. Wagner responded, "it's not cheating, it's worse" to which the Defendant responded, "I know." He interpreted this to mean that his spanking the victim was worse for Ms. Wagner than when he cheated on his first wife.

The Defendant agreed he got "hysterical" at the end of these videos saying things like, "[d]on't leave me, I beg you, I beg you," while he was crying. The Defendant agreed that this was a dramatic interaction but said that the house quickly went back to normal. The Defendant felt justified in spanking the victim, even at the time he was apologizing. The Defendant again stated that he did not know these allegations were sexual until he went to his sister's house. The Defendant agreed that he never mentioned the spanking or that the kitchen was messy or discipline in any of the recordings.

The Defendant's daughter, Megan Wilson, testified that she was the youngest of the Defendant's two biological children. She said that she was close to her father growing up but that their relationship "took a hit" when her parents got divorced. They had rekindled their relationship, and she described their relationship at the time of trial as having a "very strong bond."

Ms. Wilson said that the Defendant sometimes spanked them as a form of punishment. After spanking Ms. Wilson, the Defendant would always come and apologize because, even though he had to discipline her, it still hurt him that he had to punish her. She described him as sometimes having a repetitive apology, asking for forgiveness, and asking them if they forgave him.

20

During cross-examination, Ms. Wilson testified that each time the Defendant apologized he would rehash the reasoning for the spanking. Ms. Wilson agreed she was not present when the events surrounding the victim's allegations occurred, and she did not learn of them until October 2021.

Before jury selection, the State dismissed Count 3, sexually battery by an authority figure, as it was a lesser-included offense of rape. The jury acquitted the Defendant of incest and rape but convicted the Defendant of sexual battery by an authority figure, and the trial court sentenced him to four years, 364 days of which were to be served at 100% in the county jail and the balance to be suspended and served on supervised probation.

It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) when the trial court instructed the jury on sexual battery by an authority figure, pursuant to the theory of custodial authority, it constructively amended the indictment in Count 1 because Count 3 of the indictment alleged sexual battery by an authority figure pursuant to a theory of supervisory or disciplinary power; (2) the evidence is insufficient to sustain his conviction; (3) pursuant to the plain error doctrine, the Defendant is entitled to a new trial because the jury was presented with multiple acts of sexual contact and the State failed to elect facts upon which it was relying for conviction; (4) the trial court erred when it allowed testimony that the Defendant referred to the victim and her friends as "sluts"; and (5) the trial court erred when it excluded the results of the Defendant's polygraph examination.

## A. Constructive Amendment of Indictment

The grand jury indicted the Defendant for Count 1 rape, a Class B felony, Count 2 incest, a Class C felony, and Count 3 sexual battery by an authority figure, a Class C felony. Sexual battery by an authority figure can be committed on two bases, and the grand jury indicted the Defendant in Count 3 for sexual battery by an authority figure on the basis that the Defendant had supervisory or disciplinary power over the victim by virtue of his legal, professional or occupational status and used such power to accomplish the sexual contact. Before trial, the State dismissed Count 3. In the judgment dismissing Count 3, the notes of the trial court indicate:

Pursuant to the Notice of *Nolle Prosequi* filed by the State, it is ORDERED that this count be dismissed due to judicial economy and this count being a lesser-included of Count 1.

At the conclusion of the trial, the trial court instructed the jury on Count 1, rape, and the lesser-included offenses of rape, and Count 2, incest. As a lesser-included offense of rape, the trial court instructed the jury on aggravated sexual battery by an authority figure, which can be accomplished in two ways.

As relevant, Tennessee Code Annotated section 39-13-527 provides:

Sexual battery by an authority figure is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by the following circumstances:

(1) The victim was, at the time of the alleged offense, thirteen (13) years of age or older but less than (18) years of age; . . . [and]

(3)(A) The defendant was at the time of the offense in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used the position of trust or power to accomplish the sexual contact; or

(B) The defendant had, at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual contact.

T.C.A. § 39-13-527.

At the conclusion of trial, the trial court instructed the jury on sexual battery by an authority figure pursuant to the theory of parental or custodial authority and did not instruct the jury on the theory of sexual battery accomplished by virtue of the defendant's legal, professional, or occupational status. The jury acquitted the Defendant of rape, but it convicted him of the lesser-included offense of sexual battery accomplished by parental or custodial authority.

The Defendant contends that the trial court gave an erroneous instruction because Count 3 of the indictment charged sexual battery accomplished by virtue of the defendant's legal, professional, or occupational status and because the State cited its reasoning for

22

dismissing Count 3 as being that it was a lesser-included offense of Count 1. Accordingly, the Defendant contends that the trial court improperly instructed the jury and that its instruction constructively amended the indictment and/or created a fatal variance with the indictment. The Defendant also takes issue with the fact that the grand jury indicted him on a theory of "supervisory or disciplinary power," which was a lesser-included offense of rape. He asserts that the judgment in Count 3, by referencing Count 1, constructively amended the indictment in Count 1.

The State asserts that the trial court had a duty to instruct the jury on the lesser-included offenses raised by the evidence. Sexual battery by an authority figure, by either theory, is a lesser-included offense of rape. The State asserts that the trial court appropriately charged the jury. In response to the Count 3 dismissal, the State posits that a proper jury instruction for a lesser-included offense cannot fatally vary from or constructively amend a dismissed count of an indictment. Further, the State says that the note in the judgment dismissing Count 3 that the State was dismissing Count 3 because it was a lesser-included offense did not in any way alter or amend Count 1. That note referenced that the offense of sexual battery by an authority figure, by both theories if raised by the evidence in the upcoming trial, was a lesser-included offense of rape. The State asserts the trial court properly instructed the jury on the lesser-included offenses of Count 1, rape, that were raised by the evidence. The evidence presented at trial did not support an instruction on the theory of "supervisory or disciplinary power" but did support an instruction on the theory of "custodial authority." This, the State maintains, did not constructively amend the indictment for Count 1. We agree with the State.

An indictment or presentment must inform the accused of "the nature and cause of the accusation." U.S. Const. Amend. VI; Tenn. Const. Art. I, § 9. In addition, Tennessee Code Annotated section 40-13-202 requires that an indictment "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment."

An indictment that achieves its "overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." *State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). Our supreme court has held that an indictment is sufficient to satisfy notice requirements if it "contains allegations that (1) enable the accused to know the accusation to which answer is required; (2) furnish the trial court an adequate basis for entry of a proper judgment; and (3) protect the accused from a subsequent prosecution for the same offense." *Id*. at 299 (citing *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997)).

23

As the Defendant notes in his brief, a defendant cannot legally be convicted of an offense which is not charged in the indictment, or which is not a lesser-offense embraced in the indictment. *See State v. Cleveland,* 959 S.W.2d 548, 552 (Tenn. 1997). The Defendant also correctly notes that the State is not required to allege every theory of each offense in its charging instrument, but it is required to prove a theory it chooses to allege and may not obtain a conviction via a different theory. The Defendant's brief cites multiple cases in support of his allegation that the lesser-included offense instruction in Count 1 fatally varied from the theory posited in Count 3.

We first note that an indictment that is dismissed cannot be constructively amended or fatally vary from a conviction. We understand the Defendant's argument to hinge upon the facts that: (1) the grand jury indicted the Defendant on sexual battery pursuant to the theory of "supervisory or disciplinary power" in Count 3; and (2) the State bound itself to this theory by the note included in the judgment that Count 3 was a lesser-included offense of Count 1. We must disagree with the Defendant.

First, each count of an indictment is considered a separate indictment. *State v. Gautney*, 607 S.W.2d 907, 909 (Tenn. 1980) (citing *Wiggins v. State,* 498 S.W.2d 92 (Tenn. 1973)). When the grand jury indicted the Defendant for Count 1 rape, alleging that he "unlawfully, intentionally, knowingly and forcibly sexually penetrated" the victim, he was also charged with all the lesser-included offenses of rape. Pursuant to Tennessee Code Annotated section 40-18-110(g)(4), sexual battery by an authority figure, pursuant to both theories ("supervisory or disciplinary power" and "custodial authority") are lesser-included offenses of Count 1 rape. The grand jury also separately indicted the Defendant in Count 3 for sexual battery by an authority figure based upon "supervisory or disciplinary power." Count 3 did not allege penetration but alleged that the Defendant "intentionally touch[ed] the intimate parts and touch[ed] clothing covering the immediate area of the intimate parts of [the victim] for the purpose of sexual arousal and gratification." Before trial, the State dismissed Count 3 and moved forward solely on the theory that the Defendant sexually penetrated the victim.

At the conclusion of the trial, and as stated above, the trial court instructed the jury in Count 1 on rape and, as relevant here, on the lesser-included offense of sexual battery by an authority figure pursuant to the "custodial authority" theory but not pursuant to the "supervisory or disciplinary power" theory. Whether a lesser-included offense must be charged in a jury instruction necessarily requires a two-step analysis. First, the trial court must determine whether an offense is a lesser-included offense under the *Burns* test or by statute; then, it must determine whether a charge is justified by the evidence. *State v. Page*, 184 S.W.3d 223, 228 (Tenn. 2006) (citing *State v. Ely*, 48 S.W.3d 710, 722 (Tenn. 2001)). The second step of this analysis requires a determination that: "(1) reasonable minds could accept the offense as lesser-included; and (2) the evidence is legally sufficient to support a

24

conviction for the lesser-included offense." *State v. Wilson*, 92 S.W.3d 391, 394 (Tenn. 2002). "The trial court must provide an instruction on a lesser-included offense supported by the evidence even if such instruction is not consistent with the theory of the State or of the defense. The evidence, not the theories of the parties, controls whether an instruction is required." *State v. Nash*, 104 S.W.3d 495, 499 (Tenn. 2003) (citing *State v. Allen*, 69 S.W.3d 181, 187-88 (Tenn. 2002)).

The trial court properly exercised its discretion and authority when it instructed the jury only on the theory of "custodial authority" and not "supervisory or disciplinary power." The instruction given by the trial court was a properly given instruction on an offense that was a lesser-included offense of rape as contemplated in Count 1 and based on the proof presented at trial. The State's dismissal of Count 3 because it was a lesser-included offense of rape was accurate. Sexual battery by an authority figure pursuant to the theory of "supervisory and disciplinary power" was a lesser-included offense of Count 1. That statement is accurate. The evidence at trial, however, did not support the instruction on that lesser-included offense. This did not prohibit the trial court from instructing the jury on the other lesser-included offenses that were in fact supported by the evidence, including sexual battery by an authority figure pursuant to the "custodial authority" theory. The dismissal of Count 3, and the State's position that it was a lesser-included offense of Count 1, which it was, did not in any way constructively amend Count 1. Further, the Defendant's conviction in Count 1 did not fatally vary from his indictment.

The goal of a proper indictment includes informing the accused of the nature and cause of the accusation. The Defendant in this case was clearly informed of the accusations, and his defense team successfully defended him against the most serious allegation he faced. He was not caught unaware that he was being charged with all the lesser-included offenses of rape, and his defense even submitted a proposed jury instruction that included the "custodial authority" theory. Because the dismissal of Count 3 did not affect the lesser-included offenses of Count 1, as they are separate indictments, and because the Defendant was fully notified of the charges against him, he is not entitled to relief on this issue.

### B. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for sexual battery by an authority figure pursuant to the "custodial authority" theory because the statute requires that he knowingly used his custodial authority to accomplish the sexual contact, and the State did not prove this element of the offense. The State counters that ample evidence existed to prove that the Defendant knowingly abused his position of authority.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); see Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

26

Our General Assembly has defined the crime of sexual battery by an authority figure as being "unlawful sexual contact with a victim by the defendant" when the victim at the time of the offense was "thirteen (13) years of age or older but less th[a]n eighteen (18) years of age . . . [and]," the defendant had, "at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual contact." T.C.A. § 39-13-527(a)(1), (a)(3)(B). "Sexual contact" is defined as "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" T.C.A. § 39-13-501(6). "Intimate parts" includes "the primary genital area . . . or breast of a human being[.]" T.C.A. § 39-13-501(2).

The Defendant does not challenge whether he had custodial or parental authority over the victim. This court has previously held that a finding of parental or custodial authority is not contingent upon the defendant's being the biological parent or legal custodian of the victim. *State v. Arnold*, No. E2020-00383-CCA-R3-CD, 2022 WL 390588, at *6 (Tenn. Crim. App. Feb. 9, 2022) (citing *State v. Deunes-Cruz*, No. M2011-00879-CCA-R3-CD, 2013 WL 59342 at *13 (Tenn. Crim. App., Jan. 7, 2013) (finding evidence sufficient to sustain conviction of statutory rape by an authority figure where defendant was victim's stepfather). Rather, the Defendant argues that there was insufficient proof that he used this authority to accomplish the sexual contact. In support, the Defendant cites and summarizes numerous cases in which a defendant with custodial or parental authority had more control over discipline, was more involved, or enforced more rules over a victim. The State in contradiction cites a case in which this court affirmed a conviction for sexual battery by an authority figure based solely on the facts that the defendant paid the rent, provided food and clothing for the victim and her mother, cared for the family dog, and occasionally drove the victim to school. *See State v. Maclin*, No. W2013-00967-CCA-R3-CD, 2014 WL 2567088, at *4 *Tenn. Crim. App. June 6, 2014), *no perm. app. filed.*

We agree that the Defendant had parental or custodial authority over the victim. The issue before us, as framed by the Defendant, is what constitutes the "use" of custodial or parental authority to accomplish sexual contact. While acknowledging the cases he cites involve much more involvement by the perpetrating defendant, these cases are of little use because what we must determine is what, at a minimum, constitutes the "use" of custodial or parental authority.

In *State v. Mason*, a case involving multiple counts of rape and sexual battery, the defendant, who was the victim's stepfather, contended that without evidence that he ordered the victim to comply with the sexual penetration because he was her stepfather or that he threatened to punish her, "there is insufficient evidence that he used his parental

authority to accomplish the rapes." No. E2019-00174-CCA-R3-CD, 2020 WL 5015903, at *27 (Tenn. Crim. App. Aug. 25, 2020) (emphasis in original). The State responded that the victim testified that she complied with the defendant's requests because he told her to do so and that she did not report the abuse because the defendant told her he would get into trouble. *Id.*

We held:

> A review of similar cases in this court indicates that for purposes of coercion, the use of parental authority can be proven without the explicit commands the [d]efendant argues are necessary. *See, e.g., State v. Rodney Darnell Robinson*, No. M2019-00303-CCA-R3-CD, 2020 WL 1923152, at *21 (Tenn. Crim. App. Apr. 21, 2020) (concluding that rape by coercion using parental authority was sufficiently proven when the defendant was the custodian of two fourteen-year-old girls; the defendant digitally penetrated them after asking to examine their genital areas for educational purposes or hygiene; and it was "undisputed that, during this time period, [the d]efendant had custodial authority over [the victims]"); *State v. Perry Lewis Sisco*, No. M-2017-01202-CCA-R3-CD, 2018 WL 1019870, at *12 (Tenn. Crim. App. Feb. 21, 2018) (concluding, in relevant part, that rape by coercion using parental authority was sufficiently proven when the defendant asked his thirteen-year-old daughter to lie on his bed, penetrated her, and stopped when she objected; as well as when the defendant pulled down the victim's shorts as she slept, penetrated her, and did not stop when she objected, noting that the defendant had in both instances "used force or coercion through his parental authority"); *State v. Delbert Lee Harris*, No. 01C01-9705-CC-00177, 1998 WL 670403, at *3 (Tenn. Crim. App. Sept. 30, 1998) (noting relative to coercion that "[t]he defendant, the stepfather of the victim, penetrated her once when she was thirteen years old" and that "[t]he victim lived in his residence at the time and qualified as being in his custody").

> We think that this court's opinion in *State v. Tarrants Chandler*, No. M2013-00279-CCA-R3-CD, 2014 WL 3055972 (Tenn. Crim. App. July 7, 2014), is particularly instructive. In *Chandler*, the defendant was convicted of ten counts of rape relative to his girlfriend's minor daughter. 2014 WL 3055972, at *1. The defendant sometimes lived with the family and initially had a stepfather-type relationship with the victim. *Id.* at *6. However, when the victim was between thirteen and fourteen years old, the defendant cultivated a dating relationship with the victim that alienated her from her mother. *Id.* at *2, *6. The defendant began sexually abusing the victim when she was fourteen years old. *Id.* at *6. The defendant told the victim that after

28

she turned eighteen, they would have a family, and he referred to her as his "Future Son's Mother." *Id*. at *6, *9. The victim denied that the defendant ever used violence to accomplish the sexual contact. *Id*. at *10. On appeal, the defendant argued both that he did not have parental or custodial authority over the victim and that the proof was insufficient to establish that he used any such authority to accomplish the rapes. *Id*. at *17. After concluding that the defendant had custodial authority over the victim, this court discussed the proof relative to coercion as follows:

> As the trial court noted at the sentencing hearing, there was no question that the defendant "had become kind of the father of this family, primarily a stay-at-home father, and used his position of trust in order to kind of put that wedge between [the victim] and her mother." While the victim testified that at the time the abuse was occurring she viewed the defendant as a boyfriend and enjoyed the sexual activity, she developed this view only because the defendant had been spending time with her as a father figure. As the trial court observed, while the victim was "mature, she was still a minor and [the defendant] was able to manipulate fully her emotions." There is no merit to the defendant's claim that he did not use his custodial relationship to facilitate the sexual activity. The defendant was a father figure to the victim and exploited this relationship to begin a sexual relationship with the victim . . . . [A] rational trier of fact could have found that a custodial relationship existed and was used to effectuate a sexual relationship.

*Id.*

*Mason*, 2020 WL 5015903, at *28-29.

This court in *Mason* acknowledged that, in that case, there was no dispute that the defendant had parental authority over the victim. We held that the defendant abused his parental authority—a position of extraordinary trust. We stated that "[t]he [d]efendant's unfettered access to [the victim] arose from his parental authority over her and, therefore, he used his parental authority to manipulate [the victim] and accomplish the numerous incidents of rape for which he was convicted." *Id*. at *29.

In the case under submission, we conclude the evidence was sufficient to prove that the Defendant used his custodial or parental authority to accomplish the sexual contact. Viewed in the light most favorable to the State, the evidence showed that the Defendant paid for all the expenses for the family, as Ms. Wagner did not work outside the home. He

29

provided for the victim's food, clothing, and other living expenses. The Defendant said that he frequently picked up messes in the house made by the victim. He cultivated a "cool dad" relationship with the victim, often hosting her friends, at his expense, in his home. The Defendant greeted the victim and her friends frequently by saying "Hey, sluts." The victim was sick and vulnerable and asleep on the Defendant's couch when he got home from work. After work, he arrived at the home they shared and found her asleep on the couch. The Defendant only had access to her at this vulnerable time of day because he was her stepfather. Thinking the victim asleep, he walked toward her muttering about how "hot" she was. He then touched her in the genitalia region,[2] constituting the sexual contact, while he thought she was asleep. This was an abuse of his parental or custodial authority.

The Defendant also abused his parental or custodial authority by going into the victim's room and begging her not to leave and for her to forgive him. Again, he only had access to her bedroom at that time as a grown adult male because he was her stepfather. The videos show him begging her forgiveness and imploring her and Ms. Wagner not to leave. The recordings clearly indicate his desire for the victim not to report the incident further and to move on, as evidenced by Ms. Wagner's comment that the Defendant could not "sweep this under the rug." The victim was understandably shocked and confused by the Defendant's actions because he was her stepfather, he touched her intimately, and then tried to emotionally manipulate her into moving on. We conclude there is sufficient evidence to support the jury's finding that the Defendant used his custodial or parental authority to accomplish the sexual contact.

### C. Election of Facts

The Defendant next contends that, pursuant to the plain error doctrine, he is entitled to a new trial because the jury was presented with multiple acts of sexual contact and the State failed to elect facts upon which it was relying for conviction. The Defendant was charged in Count 1 with rape. The State elected facts that the Defendant inserted his fingers into the victim's vagina. The trial court instructed the jury on the lesser-included offense of sexual battery by an authority figure. The jury acquitted the Defendant of rape but convicted him of sexual battery by an authority figure. The Defendant asserts that there were multiple acts presented that could have constituted sexual battery by an authority figure and that the State did not properly elect facts to support that lesser-included offense. The State counters first that the Defendant is not entitled to plain error review and that the

---

[2]We understand that the victim alleged that the Defendant inserted his fingers into her vagina but by its verdict the jury found that the Defendant only had sexual contact meaning that he intentionally touched the clothing covering the immediate area of the victim's intimate parts for the purpose of sexual arousal or gratification.

law does not require the State to elect facts to support each and every lesser-included offense upon which the jury is instructed.

The parties agree that the Defendant waived this issue by failing to raise it before the trial court and that our review is, therefore, limited to plain error. Our supreme court has recognized that "[u]nlike plenary review, which applies to all claims of error that are properly preserved, plain error review is limited to those errors which satisfy five criteria." *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020). These criteria are as follows:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[A]ll five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283. The "defendant bears the burden of establishing all of these elements." *State v. Linville*, 647 S.W.3d 344, 354 (Tenn. 2022). As such, an appellate court "need not consider all of the elements when it is clear from the record that at least one [of] them cannot be satisfied." *State v. Reynolds*, 635 S.W.3d 893, 931 (Tenn. 2021). "Whether the plain error doctrine has been satisfied is a question of law which we review de novo." *State v. Knowles*, 470 S.W.3d 416, 423 (Tenn. 2015).

Before an error may be recognized, it "must be 'plain' and it must affect a 'substantial right' of the accused." *Adkisson*, 899 S.W.2d at 639. Plain error review is that it applies only to errors that are "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). The error must be "of such a great magnitude that it probably changed the outcome of the trial." *State v. Adkisson*, 899 S.W.2d at 642. Because of this demanding standard, "[o]nly rarely will plain error review extend to an evidentiary issue." *State v. Haymer*, 671 S.W.3d 568, 578 (Tenn. Crim. App. 2023) (citation omitted).

"Because the election requirement safeguards a criminal defendant's fundamental, constitutional right to a unanimous jury verdict, errors pertaining to the sufficiency of the prosecution's election are subject to plain error review." *Knowles*, 470 S.W.3d at 424 (citing *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1975)). "When applying plain error review," in the context of a challenge to the State's election of offenses, the reviewing court "must bear in mind that the election requirement is merely a means by which to protect the

right to a unanimous verdict." *Knowles*, 470 S.W.3d at 424. Importantly, "the election requirement applies to offenses, not to the facts supporting each element of the offense." *Id*.

When the evidence received at trial indicates that the defendant has committed more offenses against the victim than were charged in the indictment, the State must elect the facts upon which it intends to rely for each count of the indictment in order to protect "the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001); *see also State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). "The election doctrine refers to the prosecutor's duty in a case where evidence of multiple separate incidents is introduced to elect for each count charged the specific incident on which the jury should deliberate to determine the defendant's guilt." *State v. Qualls*, 482 S.W.3d 1, 9 (Tenn. 2016).

The State must make its election at the close of its case-in-chief, and the trial court must then properly instruct the jury so that deliberations remain confined to the elected offenses. *See Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). Importantly, however, the election requirement "applies to offenses, not to the facts supporting each element of the offense." *See State v. Knowles*, 470 S.W.3d 416, 424 (Tenn. 2015). Thus, an election need not catalog every detail of an incident; rather, "[a]ny description that will identify the prosecuted offense for the jury is sufficient." *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993). And when the proof describes non-generic, distinguishable acts separated by time, circumstance, or modality, a conventional election identifying each discrete incident is sufficient to safeguard unanimity. *See Johnson*, 53 S.W.3d at 632-33.

The State in this case elected the fact that the Defendant inserted his finger into the victim's vagina to support the offense of Count 1, rape. The jury by its verdict concluded that the Defendant touched the victim in her genitalia area in a manner constituting sexual contact but did not penetrate her genitalia. As the State notes, it is required to elect facts to support the conviction it seeks in the indictment, but we find no law requiring it to elect facts to support each and every lesser-included offense. Instead, the election is required for the charged offense. As in this case, if the jury found penetration for that offense, it would have convicted the Defendant of rape. Because it found no penetration, it convicted him of sexual battery by an authority figure. The jury was instructed, and we presume it followed the instruction, to only consider the incident about which the State had elected facts. The election of the facts by the State was sufficient.

As further support for this holding, and as the State points out, the Supreme Court has said of sexual battery:

32

> If the entire instance of sexual contact occurs quickly and virtually simultaneously, then only one offense has occurred even if more than one touching has occurred. Accordingly, the prosecution need not elect which touch it is relying upon to establish sexual contact – an element of the charged offense – sexual battery.

*Johnson*, 53 S.W.3d at 633. In this case, all the sexual contact occurred in a twenty second to one minute time window. This constituted only one offense, and the prosecution needed not elect which touch it was relying upon to establish the sexual contact. Accordingly, we cannot conclude that a clear and unequivocal rule of law was breached, so as to entitle the Defendant to plain error review. As such, the Defendant is not entitled to relief on this issue.


### D. Defendant's "Sluts" Reference

The Defendant contends the trial court erred when it allowed testimony that the Defendant referred to the victim and her friends as "sluts." In support, the Defendant cites to multiple times that the State referenced the use of this term in its closing argument. The State counters that the trial court acted within its discretion when it allowed this testimony as relevant to show the Defendant's intent.

"Trial courts have broad discretion in determining the admissibility of evidence and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is typically admissible, while irrelevant evidence is inadmissible. Tenn R. Evid 402.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). This Court finds an abuse of that discretion when the trial court applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Lewis*, 235 S.W.3d at 141 (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

Tennessee law provides that proof of other crimes, wrongs, or acts committed by the defendant is not admissible to prove the defendant's propensity to commit a crime. *See* Tenn. R. Evid. 404(b); *State v. Reynolds*, 635 S.W.3d 893, 921-23 (Tenn. 2021) (citing generally *State v. Rodriguez*, 254 S.W.3d 361, 375-76 (Tenn. 2008) (discussing general exclusion of propensity evidence).

Tennessee Rule of Evidence 404(b) provides:

Other Crimes, Wrongs, or Acts. — Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

In addition, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b); *State v. Thacker*, 164 S.W.3d 208, 239-40 (Tenn. 2005).

The record in this case demonstrates that the trial court complied with the structure detailed in Rule 404(b). Our standard of review, therefore, requires that to reverse the lower court, we must find that the trial court abused its discretion in its ruling. *Reynolds*, 635 S.W.3d at 921 (citing *State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014); *State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005)). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Id*. (citations omitted).

In the case under submission, the trial court determined that the Defendant's use of the term "sluts" when referring to the victim and her friends was relevant to show intent and that the probative value of the evidence was not outweighed by the danger of unfair prejudice. We conclude the trial court did not abuse its discretion in this regard. The victim testified that the Defendant was mumbling things like "she's so hot" while walking back

and forth between her and the kitchen. He then sexually assaulted her. The trial court did not err when it determined the fact that he referred to the victim and her friends as "sluts," a term sexual in nature, was relevant to show his intent when he touched the victim. The trial court did not apply an incorrect legal standard, reach an illogical decision, or base its decision on an erroneous assessment of the evidence.

As to the implication that the State's recount of the Defendant's use of this term in closing arguments was inappropriate, the courts of this state have traditionally given counsel wide latitude in presenting their position, and a trial court's action in controlling the argument of counsel will not be reversed unless the court abused its discretion. *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978) (citing *Smith v. State*, 527 S.W.2d 737 (Tenn. 1975)). The jury was instructed that arguments were not evidence. We presume the jury follows the instructions of the trial court. *See State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008); *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998). The Defendant is not entitled to relief on this issue.

## E. Polygraph Results

The Defendant lastly contends the trial court erred when it excluded the results of the Defendant's polygraph examination. The Defendant acknowledges that we are bound by the Tennessee Supreme Court decision in *State v. McCaleb*, 582 S.W.3d 179 (Tenn. 2019) and its progeny which hold that polygraph test results, testimony concerning such results, and testimony concerning a defendant's willingness or refusal to submit to a polygraph test are inadmissible based on relevancy and reliability concerns. He concludes that "but for existing Tennessee Supreme Court preceden[t], the Tennessee Rules of Evidence should permit the introduction of the result of the polygraph examination." The State counters that this court is not in a position to issue an advisory opinion.

This court is bound by the decisions of our supreme court. *Thompson v. State*, 958 S.W.2d 156, 173 (Tenn. Crim. App. 1997). Our court may only review the "final judgments of trial courts." T.C.A. § 16-5-108(a). "'[I]t is a controlling principle that inferior courts must abide the orders, decrees and precedents of higher courts. The slightest deviation from this rigid rule would disrupt and destroy the sanctity of the judicial process.'" *Thompson*, 958 S.W.2d 173 (citing *State v. Irick*, 906 S.W.2d 440, 443 (Tenn. 1995) (quoting *Barger v. Brock*, 535 S.W.2d 337, 341 (Tenn. 1976)).

The Tennessee Supreme Court held: "'Tennessee courts have held repeatedly that polygraph test results, testimony concerning such results, and testimony concerning a defendant's willingness or refusal to submit to a polygraph test are inadmissible.'" *McCaleb*, 582 S.W.3d at 189 (citations omitted). This rule likely protects a defendant and

35

his rights more often than hinders his ability to present a defense. We will not issue an opinion beyond that issued by the *McCaleb* court. The Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning, the trial court's judgment is affirmed.


s/ *ROBERT W. WEDEMEYER*_____
ROBERT W. WEDEMEYER, PRESIDING JUDGE

36